Filed 8/18/25  P. v. Ciccimaro CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D083545 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD293903) |
| DOMINIC A. CICCIMARO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert O. Amador, Judge.  Affirmed.

George L. Schraer for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Jon S. Tangonan, Deputy Attorneys General, for Plaintiff and Respondent.


A jury convicted Dominic A. Ciccimaro of attempted murder and assault with a deadly weapon after he stabbed a stranger with a three-inch knife 21 times.  The trial court sentenced Ciccimaro to eight years in prison.

On appeal from the judgment of conviction, Ciccimaro asserts insufficient evidence of his intent to kill support the attempted murder conviction and that the jury was improperly instructed on attempted voluntary manslaughter based on imperfect self-defense. As we explain, we reject Ciccimaro's arguments and affirm the judgment of conviction.

FACTUAL AND PROCEDURAL BACKGROUND

At trial, the parties presented two opposed versions of the incident that led to Ciccimaro's conviction. The prosecution presented the testimony of the victim, F.N., who told the jury Ciccimaro brazenly attacked him. Ciccimaro, in contrast, testified he was attacked by F.N. and stabbed F.N. in self-defense. Ciccimaro's testimony, however, was impeached by statements he gave to the police in the moments after the encounter and during an interview with detectives several hours later.

A. *The Prosecution's Case*

On the morning of the attack, F.N. arrived at his job as a warehouse supervisor in downtown San Diego around 8:00 a.m. Around 12:30 p.m., F.N. took his lunch break. F.N. was depressed and decided to purchase a six-pack of beer, then drove to a nearby park where he drank five or six beers. About an hour later, F.N. decided to leave the park to eat his lunch and drove to a shady area along the alley of Russ Boulevard. F.N. parked so that his truck's bed was in front of Ciccimaro's garage. F.N. had never parked there before.

F.N. was sitting in his idling truck for five to ten minutes, when Ciccimaro's garage door opened and hit the truck's rear wheel well. F.N. got out of the truck to see what happened and found a small smudge of brown paint from the garage door on the wheel well. F.N. then heard yelling and saw Ciccimaro exit the gate next to the garage. F.N. testified that Ciccimaro

2

seemed angry, and was yelling something like, "You're not supposed to park here." F.N. responded, "There's no damage" or "I don't see any damage."

F.N. testified Ciccimaro said "F— you," to which F.N. replied, "F— you, too." F.N. said he did not threaten Ciccimaro or display aggressive body language, and denied punching at Ciccimaro. After F.N. said "F— you, too," the next thing F.N. remembered was Ciccimaro "putting a knife on [his] chest," being pinned against his truck, and Ciccimaro stabbing him in the chest and neck. F.N. then tried to push Ciccimaro away with his left hand, but Ciccimaro grabbed F.N.'s left arm and continued stabbing him in the back and shoulder. F.N. repeatedly pleaded, "Let me go," but Ciccimaro continued to attack with the knife.

F.N. kneed Ciccimaro in the chest, causing Ciccimaro to step back. But, Ciccimaro lunged again, and continued to stab F.N. on the left side of his body. F.N. punched Ciccimaro in the face, finally causing Ciccimaro to stop his attack. F.N. asked Ciccimaro why he had stabbed him. F.N. then got into his truck and drove off. Realizing the severity of his injuries, F.N. stopped a few blocks away when he saw two City of San Diego Parks and Recreation employees. As F.N. approached the two men, he fell to his knees in the street. By this time, Ciccimaro and his wife had called 911 and responding police officers soon found F.N., bleeding heavily and unable to speak. The officers rendered first aid until the paramedics arrived and transported F.N. to the hospital. F.N. went in and out of consciousness in the ambulance, and recalled fearing for his life in the emergency department.

When he arrived at the hospital, trauma doctors found F.N. had dangerously low blood pressure and was actively bleeding from his neck and chest wounds. His blood alcohol level was measured at 177 mg/L2, equivalent to a blood alcohol level of 0.15 percent. F.N. had critical wounds

near his jugular vein and trachea, and chest wounds that posed a risk of fluid buildup around his heart. F.N. was in hemorrhagic shock from blood loss, and three surgeons performed an emergency procedure to control the bleeding.

The surgeons found stab wounds in F.N.'s left neck, chest, shoulder, left flank, and thoracoabdominal area, which all required immediate intervention to prevent death. The doctors repaired a laceration to F.N.'s internal jugular vein, examined his pericardium for internal bleeding, repaired a stab wound to his diaphragm, and treated injuries to his spleen. They also treated a collapsed lung by inserting a chest tube to drain blood pooling in his chest cavity. After a six-hour operation, F.N. was placed on a breathing machine in the ICU, and remained hospitalized for seven days. F.N. testified he suffered 21 stab wounds in total.

B. *The Defense Case*

The defense first presented the testimony of a forensic toxicologist, who testified F.N.'s blood alcohol level of 0.15 percent can lead to memory impairment and exacerbate aggressive tendencies. In addition, the expert testified that a prescription medication F.N. took regularly, Zoloft, can also cause increased impulsiveness and violent tendencies when mixed with alcohol.

Ciccimaro then testified in his own defense. Ciccimaro told the jury that on the day of the encounter, he went to work at his job as an electrical engineer for a military defense firm at approximately 3:30 a.m. and left work at 1:00 p.m. Ciccimaro arrived home around 1:30 p.m. Ciccimaro described the location of his property as fronting A Street and extending to an alleyway behind the house on Russ Boulevard. Once home, Ciccimaro went to his garage, which opened up to the Russ Boulevard alleyway, to work on his

4

Jeep. When he got into the garage, Ciccimaro tried to open the garage door, but it only opened about three feet before striking F.N.'s truck and closing again.

Ciccimaro said he then left the garage, and exited his property through a gate next to the garage that opened to Russ Boulevard. He saw F.N. kneeling and inspecting his truck, which was parked about six inches from the garage door. Ciccimaro testified F.N. seemed angry, and Ciccimaro assumed F.N. was mad the garage door struck his truck. Ciccimaro told F.N. parking was not allowed in the alley and asked him to move so he could access his garage. Ciccimaro told the jury F.N. did not respond verbally but instead "glared" at him. F.N. then walked towards Ciccimaro, got in his face, and said he was not parked because his truck was idling.

Ciccimaro also testified he thought F.N. was "walk[ing] up to me kind of like he was going to start a fight, but he didn't." Ciccimaro, however, acknowledged F.N. did not clench his fists, make aggressive hand movements, or issue any threat. Ciccimaro said F.N. then turned away and walked back to his truck, and Ciccimaro went back into his property through the gate. Ciccimaro then heard a loud bang, which he thought was F.N. kicking his garage door. Ciccimaro went back outside to the gate and saw F.N. again "glaring" at him. Ciccimaro then repeatedly asked F.N. to leave, but F.N. remained silent and motionless. Ciccimaro testified he then went back inside, locked the gate, and headed back to the garage. Before he got inside, Ciccimaro heard F.N. say, "I'll leave if you apologize." When Ciccimaro turned back, he saw F.N. standing directly in front of the gate.

Ciccimaro testified he told F.N. he would not apologize, then walked back inside the gate and yelled, "Can you just f—ing go? F—ing leave. Just leave." Ciccimaro said he then heard another bang, which he thought

5

sounded like F.N. kicking his gate. Ciccimaro went outside his gate a third time and saw F.N. still standing there. Ciccimaro unlocked the 4.5-foot-tall gate, and saw F.N. was directly in front of it, startling him. Ciccimaro testified F.N. then said, "Run, you scared little B—." Ciccimaro responded by telling F.N. to leave. Ciccimaro told the jury that when he opened the gate, F.N. stepped forward and swung at him, striking him in the face.

Ciccimaro said he responded to the punch by grabbing F.N.'s left shoulder, then F.N. placed Ciccimaro in a headlock with his left arm and punched him with his right. Ciccimaro, who was 58 years old at the time and had bad shoulders and a knee injury, said he feared F.N. would overpower him, especially if he was forced to the ground. Ciccimaro testified F.N. looked much younger and to be in good shape. Because Ciccimaro could not break free from F.N.'s headlock, he pulled the knife from his pocket, which he carried regularly for work, opened it with his other hand, and stabbed F.N. three times in the side. Ciccimaro said F.N. continued punching him unphased by the initial stabbing. Ciccimaro said he tried to push F.N. away, but F.N. held on, so Ciccimaro began stabbing wildly to break free. F.N. then finally let go, and Ciccimaro backed away while F.N. retreated toward the driver's side door of his truck.

Ciccimaro testified that once F.N. was free, he accused Ciccimaro of assaulting him and Ciccimaro responded that F.N. attacked him first. Ciccimaro told F.N. to wait and he would ask his wife, who was inside, to call for help. Ciccimaro walked through the gate, went inside, and told his wife to call 911 because someone was "badly injured in the alleyway." A recording of the 911 call was played for the jury.

Aside from the three stab wounds to F.N.'s side, Ciccimaro could not recall what other areas of F.N.'s body he stabbed. Ciccimaro was not aware

6

that he sustained any injuries until one of the detectives who interviewed him pointed out his nose was bruised and bloody. Ciccimaro said he had not noticed his injuries because he was in shock from the altercation and arrest. Later, while in jail, Ciccimaro realized his nose was painful, and he had a sore forehead and neck. Ciccimaro said he had no memory of being hit, but he believed the bruising was from F.N. punching him and putting him in a headlock.

On cross-examination, Ciccimaro admitted he told the detectives who interviewed him a few hours after his arrest that, "I pulled my knife, I didn't even wait. He threw a punch and I pulled the knife and that was it." Ciccimaro also admitted he did not believe F.N.'s first punch actually hit him. Ciccimaro conceded that when he first pulled out his knife, he did not think he was in immediate danger of death. He also conceded he told the detectives he would have shot F.N. if he had a gun.

C. *Rebuttal*

After the defense rested its case, the prosecution introduced a video from the body-worn camera of one of the police officers who responded to the scene and interacted with Ciccimaro shortly after his arrest. In the video, Ciccimaro tells the officer that F.N. threw a punch at him, but he was not sure whether it landed before he stabbed F.N. the first time. Ciccimaro also said that after the first stab, F.N. did not back off, and instead grabbed Ciccimaro and started punching him. Ciccimaro told the officer he started stabbing F.N., and finally got F.N. off of him.

The prosecution also played a video recording of Ciccimaro's interview with police detectives a few hours after the encounter. In the video, Ciccimaro recounted the events leading to the physical altercation, but stated he could not recall if F.N.'s initial punch connected. Ciccimaro stated

7

everything happened very quickly, and that as soon as F.N. threw a punch, Ciccimaro "pulled out [his] knife real quick. … Grabbed [F.N.] … And stabbed him." Ciccimaro explained after the initial stabbing, he and F.N. kind of "grappled and [he] started stabbing [F.N.] more and more."

Ciccimaro also told the officers that after F.N.'s initial punch, he grabbed F.N. by the shoulder then stabbed him multiple times in the side. Ciccimaro also said he stabbed F.N. probably 15 times in order to stop F.N. He told the officers that "if I owned a gun and had a concealed carry permit, [I] probably would've just shot him" and that it would have been lawful to shoot F.N. in self-defense. Ciccimaro also admitted he had the opportunity to retreat inside his house and avoid the whole situation, or that he could have called the police after he heard F.N. kick his garage door.

D. *Conviction and Sentencing*

Ciccimaro was charged with attempted murder in violation of Penal Code sections 664 and 187, subdivision (a)[1] (Count 1) and assault with a deadly weapon in violation of section 245, subdivision (a)(1) (Count 2). The charging information also alleged Ciccimaro inflicted great bodily injury in violation of section 12022.7, subdivision (a), and that he personally used a knife during the commission of Count 1 in violation of section 12022, subdivision (b)(1). At the conclusion of the trial, the jury found Ciccimaro guilty on both counts, found true the great bodily injury allegation on both counts, and found true the allegation that Ciccimaro personally used a knife during the commission of Count 1.

At the subsequent sentencing hearing, the trial court sentenced Ciccimaro to a total of eight years in prison. The sentence consisted of a five-year prison term for Count 1, and an additional three-year term for the great

---

[1] Subsequent undesignated statutory references are to the Penal Code.

bodily injury enhancement.  The trial court stayed the sentences on Count 2 and the personal use of a knife enhancement pursuant to section 654.

Ciccimaro filed a timely notice of appeal.

DISCUSSION

I

Ciccimaro first asserts his conviction for attempted murder must be reversed because there was insufficient evidence to support the jury's finding that he intended to kill F.N.  Specifically, he argues there was no evidence of motive, the stabbing wounds were random, the weapon used was inconsistent with an intent to kill, and he called 911 after the attack.  The Attorney General responds that Ciccimaro's argument improperly asks the court to reconsider the jury's determination.  We agree with the Attorney General.

A

*Legal Principles*

"Given this court's limited role on appeal, [Ciccimaro] bears an enormous burden in claiming there was insufficient evidence to sustain his conviction."  (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)  In assessing the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)  "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).)

This court's review must presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the

9

evidence.  (*Bolin, supra*, 18 Cal.4th at p. 331.)  Thus, "review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

A conviction for attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  (*People v. Smith* (2005) 37 Cal.4th 733, 739.)  "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' " (*Ibid.*)  " 'Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact.' "  (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1552 (*Gonzalez*).)  There is rarely direct evidence of a defendant's intent to kill.  (*Smith,* at p. 741.)  Rather, evidence of intent is usually derived from the circumstances, including the defendant's actions. (*Ibid.*)

B

*Analysis*

We agree with the Attorney General that Ciccimaro's argument amounts to a request for this court to second-guess the jury's finding that he intended to kill F.N.  Contrary to Ciccimaro's assertions on appeal, the jury was presented with significant circumstantial evidence supporting its conclusion that Ciccimaro acted with intent to kill when he stabbed F.N. 21 times.  As discussed, direct evidence of a defendant's intent is rare and evidence of intent is most frequently circumstantial.

Here, while Ciccimaro's own testimony pointed to self-defense, other circumstantial evidence pointed to his intent to kill. Specifically, F.N.'s testimony, credited by the jury, that Ciccimaro stabbed F.N. without physical provocation over and over again was strong evidence that Ciccimaro intended to kill F.N. (See *Gonzalez, supra*, 126 Cal.App.4th at p. 1552 ["intent was established by the evidence of [defendant's] unprovoked attack that rendered the unarmed victim prone and defenseless"].) Further, Ciccimaro conceded that F.N. did not draw any weapon, that he wasn't sure if F.N. landed a punch, that he did not fear for his immediate safety, and that he stabbed F.N. 21 times—including in the neck—with a 3-inch knife blade. This evidence adequately supported the jury's finding that Ciccimaro intended to kill F.N. (See *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 ["Substantial evidence support[ed] the jury's finding defendant intended to kill" where the "defendant stabbed the victim not in the arm or leg, but in the abdomen, an extremely vulnerable area of the body"]; *People v. Silva* (1953) 41 Cal.2d 778, 782 ["The extent and location of a knife wound are pertinent to a determination of the intent with which it was inflicted."].)

Ciccimaro argues that F.N. parking in front of his garage and not moving in response to Ciccimaro's request does "not provide a normal or rational motive to try to intentionally kill another person." That a "normal" or "rational" person would not kill on this basis, however, does not negate the circumstantial evidence that supported the jury's determination that Ciccimaro tried to kill F.N. (See *People v. Avila* (2009) 46 Cal.4th 680, 703 (*Avila*) [" 'if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding' "].)

Similarly, Ciccimaro points to the randomness of the stab wounds sustained by F.N., and his testimony that the knife "was a tool [he] carried on his person because he used it for his job for work" that "had a small blade that was three inches long." Again, these facts might support a contrary finding, but they do not allow this court to override the actual finding made by the jury. (*Avila, supra*, 46 Cal.4th at p. 703.) Likewise, Ciccimaro argues that because he went inside after the altercation and had his wife call 911, this evidence shows "absence of an intent to kill." As with the other facts Ciccimaro points to, and as Ciccimaro explicitly concedes in his brief, this "conduct does not conclusively establish that he did not intend to kill" F.N. and, thus, also does not support reversal of the jury's intent finding.

As the Attorney General points out, F.N. sustained serious life-threatening injuries from Ciccimaro's attack, including a collapsed lung and injury to his jugular vein. F.N. also testified that Ciccimaro stabbed him without any physical provocation. Ciccimaro himself conceded he was not in fear for his life. This was strong circumstantial evidence that Ciccimaro harbored an intent to kill. In sum, the jury was entitled to accept F.N.'s version of events, and reject the story Ciccimaro presented in his testimony. It is not this court's role to second guess the jury findings, and we decline Ciccimaro's invitation to do so with respect to the element of intent.

## II

Ciccimaro next asserts the court improperly instructed the jury on attempted voluntary manslaughter based on imperfect self-defense. He argues the court was required to instruct the jury that if Ciccimaro reasonably believed he was in danger of death or great bodily injury, and reasonably believed deadly force was necessary to defend against that danger, imperfect self-defense would apply if Ciccimaro used "more force than

12

[wa]s reasonably necessary to defend against that danger." The Attorney General responds that Ciccimaro forfeited this argument by failing to raise it in the trial court, and even if the argument was not forfeited, it lacks merit.

A

*Additional Background*

After the conclusion of the evidence, the court instructed the jury on self-defense with CALCRIM No. 3470. The instruction stated, in relevant part: "Self-defense is a defense to attempted murder and assault with a deadly weapon. The defendant is not guilty of those crimes if he used force against the other person in lawful self-defense. The defendant acted in lawful self-defense if: [¶] 1. The defendant reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully; [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND 3. The defendant used no more force than was reasonably necessary to defend against that danger. [¶] ... [¶] Defendant's belief must have been reasonable and he must have acted because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful self-defense."

The instruction further told the jury: "A defendant is not required to retreat. He is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or bodily injury has passed. This is so even if safety could have been achieved by retreating. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the

13

People have not met this burden, you must find the defendant not guilty of attempted murder and assault with a deadly weapon."

The jury was also instructed on attempted voluntary manslaughter based on imperfect self-defense with CALCRIM No. 604. The instruction stated, in relevant part: "An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill someone because he acted in imperfect self-defense. [¶] If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense if: [¶] 1. The defendant took at least one direct but ineffective step toward killing a person; [¶] 2. The defendant intended to kill when he acted; [¶] 3. The defendant believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] AND 4. The defendant believed that the immediate use of deadly force was necessary to defend against the danger. [¶] BUT 5. At least one of the defendant's beliefs was unreasonable."[2]

---

[2]    The court also instructed the jury with CALCRIM Nos. 3471, "Right to Self-Defense: Mutual Combat or Initial Aggressor;" 3472, "Right to Self-Defense: May Not Be Contrived," which states that a person who provokes a fight "with the intent to create an excuse to use force" does not have a right to self-defense; 3474, "Danger No Longer Exists or Attacker Disabled," which states that "[t]he right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist;" and 603, "Attempted Voluntary Manslaughter: Heat of Passion."

14

B

*Legal Principles*

" 'We review a claim of instructional error de novo.  [Citation.]  "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' " '  [Citation.]  'Generally, the trial court is required to instruct the jury on the general principles of law that are closely and openly connected with the evidence and that are necessary to the jury's understanding of the case.  [Citation.]  It also has a duty to refrain from giving incorrect instructions or instructions on principles of law that are irrelevant and that would have the effect of confusing the jury or relieving it from making findings on the relevant issues.' "  (*People v. Morales* (2021) 69 Cal.App.5th 978, 990 (*Morales*).)

C

*Analysis*

As an initial matter, we agree with the Attorney General that Ciccimaro forfeited his argument by not raising the issue in the trial court. As the Attorney General points out, Ciccimaro did not object to the court's instructions on self-defense and imperfect self-defense; rather, defense counsel simply requested "each and every self-defense instruction." Ciccimaro's counsel made no request for any additional clarifying instruction with respect to the issue he now asserts on appeal.  Accordingly, Ciccimaro's claim on appeal is forfeited.  (*People v. Jackson* (1996) 13 Cal.4th 1164, 1223.) Regardless, we conclude that no instructional error occurred.

A defendant is entitled to acquittal if the evidence raises a reasonable doubt about guilt based on self-defense.  (See *People v. Ayers* (2005) 125 Cal.App.4th 988, 997.)  To justify an act as self-defense, the defendant must have an honest and reasonable belief that bodily injury is about to be

inflicted on him. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064–1065.) Further, the risk of injury must be imminent, and the defendant may not use more force than is reasonable under the circumstances. (*Ibid.*) Thus, "deadly force or force likely to cause great bodily injury[, at issue here,] may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury." (*People v. Clark* (1982) 130 Cal.App.3d 371, 380, abrogated on other grounds by *People v. Blakeley* (2000) 23 Cal.4th 82.)

In addition, the doctrine of self-defense "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*People v. Enraca* (2012) 53 Cal.4th 735, 761.) "[A] victim may respond to an attacker's initial physical assault with a physical counterassault, and an attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim's lawful resistance. [Citation.] And when a defendant contrives a 'deadly' assault [Citation], there can be no incommensurate or unjustifiable response by the victim: he or she is fully entitled to use deadly force and the defendant has no right to claim self-defense against those deadly measures." (*People v. Ramirez* (2015) 233 Cal.App.4th 940, 947.) However, "a defendant may claim imperfect self-defense when faced with the original victim's sudden escalation to deadly force." (*Id.* at p. 950, italics omitted.)

"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually* but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re*

16

*Christian S.* (1994) 7 Cal.4th 768, 771.) "The concepts of perfect and imperfect self-defense are not entirely separate, but are intertwined." (*People v. Valencia* (2008) 43 Cal.4th 268, 288 (*Valencia*).) Thus, "not every unreasonable belief will support a claim of imperfect self-defense but only one that, if reasonable, would support a claim of perfect self-defense." (*Ibid.*)

Ciccimaro complains that the jury should have been instructed that a finding of imperfect self-defense was required if he used "more force than was reasonably necessary against the danger [Ciccimaro] perceived he was facing." This argument was rejected by the First District Court of Appeal in *Morales, supra*, 69 Cal.App.5th 978. There, after the defendant, Morales, was robbed by the victim, McMillian, Morales stabbed McMillian in the abdomen with a seven-and-a-half inch kitchen knife, killing him. (*Id.* at p. 985.)

On appeal from a murder conviction, Morales argued the instruction given on imperfect self-defense was deficient "because it failed to tell the jury that a homicide also qualifies as voluntary manslaughter and not murder when a defendant's beliefs in danger and the need to use deadly force are reasonable but the sort of deadly force he uses is excessive and more than necessary to repel the attack." (*Morales, supra*, 69 Cal.App.5th at p. 995.) Morales "argue[d] that if the jury found he reasonably believed he would suffer great bodily injury from McMillian in the course of the robbery and reasonably believed he needed to arm himself against McMillian, but found that stabbing McMillian in the abdomen was more force than was reasonably necessary, the jury could find him guilty of voluntary manslaughter." (*Ibid.*)

The First District rejected the argument, holding "Morales does not explain how his stabbing could be based on his reasonable belief in the need to use … *deadly* force but still qualify as *excessive*. If Morales reasonably

17

believed he needed to use deadly force to prevent McMillian from harming him, his use of a single stab with his knife would appear to be reasonable." (*Morales, supra*, 69 Cal.App.5th at p. 996, fn. omitted.)  The court further stated that "Morales also cites no authority for his position that one type of deadly force could be reasonable but another could be excessive.  The relevant consideration is whether a defendant uses more force than is necessary to repel an attack, not the type of deadly force used by a defendant." (*Ibid*.)

Ciccimaro contends *Morales* is distinguishable because the defendant there stabbed the victim once, while he stabbed F.N. multiple times, making it possible for the jury to conclude that he reasonably believed the use of deadly force was necessary, but that he unreasonably used too much force by continuing to stab F.N.  We are not persuaded by this contention.  First, if *deadly* force was reasonable in response to F.N.'s conduct, no amount of force by Ciccimaro would be unreasonable.

Second, the instructions that were provided to the jury, CALCRIM No. 604 and 3470, adequately instructed the jury of this principle.  As noted, CALCRIM No. 3470 explained that self-defense requires the defendant use no more force than reasonably necessary to defend against the danger.  In addition, CALCRIM No. 604 told the jury that Ciccimaro acted in imperfect self-defense if he "believed that the immediate use of *deadly force* was necessary to defend against the danger" but that belief "was unreasonable." (Italics added.)  Under these instructions, if the jury determined Ciccimaro's use of some amount of force was reasonable to defend himself, but Ciccimaro unreasonably used excessive force, it could convict him of attempted voluntary manslaughter based on imperfect self-defense.[3]  Because these

---

[3]    Tellingly, Ciccimaro does not specify what further instruction the court should have given.

18

instructions appropriately advised the jury of these legal principles, the trial court was under no further duty to explain them and there was no instructional error. [4] (See *People v. Dieguez* (2001) 89 Cal.App.4th 266, 276 ["There is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial. As long as the trial court has correctly instructed the jury on all matters pertinent to the case, there is no error."].)

DISPOSITION

The judgment of conviction is affirmed.

McCONNELL, P. J.

WE CONCUR:

IRION, J.

CASTILLO, J.

---

[4]     Ciccimaro also asserts that if "the only relevant factor [for purposes of determining whether the defendant acted in imperfect self-defense] is whether the use of any sort of deadly force was reasonable …, it makes no sense to put into CALCRIM No. 3470 the language about the defendant being permitted to use 'no more force than was reasonably necessary to defend against th[e] danger.'" We disagree. This portion of the instruction is precisely addressed to the issue that Ciccimaro raises. If, as these instructions provided, the defendant used more force than reasonably necessary, lawful self-defense is unavailable but imperfect self-defense could be found by the jury. (See *Valencia, supra*, 43 Cal.4th at p. 288 ["The concepts of perfect and imperfect self-defense are not entirely separate, but are intertwined."].) As discussed, Ciccimaro's jury properly rejected this theory.

19